ANNA M. CARLING

*v.*

W. MONROE CARLING.

[Argued December 13th, 1910.]

In a suit for divorce a plea in bar was filed by the defendant setting up a previous decree adjudging a decree *a vinculo* between the parties by a court of another state in a suit brought therein by the defendant, claiming residence in that state, against the complainant. Upon the complainant in the present suit contending that such decree was obtained by the defendant's fraudulent representation that he was a *bona fide* resident of that state, evidence examined and *held*, that the plea was not sustained.

On bill for divorce.

*Mr. W. Holt Apgar,* for the complainant.

*Mr. Linton Satterthwait,* for the defendant.

STEVENS, V. C.

This is a suit for divorce on the ground of desertion. To the bill the defendant has interposed a plea in which it is averred that on December 19th, 1904, he had been for more than six months a *bona fide* resident of South Dakota; that on that day he filed in the office of the circuit court of the second judicial district, county of Lincoln, State of South Dakota, his complaint for divorce from complainant on the ground of extreme cruelty; that by the law of that state, divorce may be granted on that ground, but not unless the plaintiff has been a *bona fide* resident for at least six months next preceding the commencement of the action; that no answer, demurrer or appearance had been put in by defendant; and that after a hearing, the court, on January 30th, 1905, adjudged a divorce *a vinculo* between the parties.

The sole issue is whether this adjudication constitutes a bar

to the present proceeding. The contention is that the decree was obtained by the fraudulent representation that the defendant was a *bona fide* resident of Dakota.

The parties were married July 11th, 1895. The defendant is a physician, thirty-eight years old. Prior to June, 1904, he and his wife had been living with defendant's mother, at 230 South Clinton avenue, Trenton, New Jersey. They had quarreled a good deal and defendant had, according to the weight of the evidence, offered complainant $2,000 if she would leave his mother's house and let him bring a suit for desertion. This she refused to do. About June 10th, 1904, or a few days prior thereto, he left Trenton and went to Sioux Falls, South Dakota. He first lodged with a Mrs. Clark and then with a Mrs. Phillips. Mrs. Phillips says he came to her house on July 23d, 1904, and that he roomed there until the following March; that he did not stay away any length of time, except on one occasion, for a week or two, when he went to Philadelphia. In March, 1905, probably, he went to Denver, in the State of Colorado, and in May or June of that year was awarded a certificate authorizing him to practice medicine there. He took an appointment in the University of Denver as an assistant eye surgeon, and resided and voted in Denver until December 24th, 1909, when he returned to Trenton, where he is now residing.

The bill in this case was filed on July 25th, 1906. A plea was filed on October 26th, 1906, and an amended plea on October 5th, 1907. The defendant married again on November 13th, 1907. He appears to have done so with full knowledge that the suit was pending.

The question is whether he was a *bona fide* resident of Dakota for the six months prior to December 19th, 1904, the day when he began suit. The divorce was granted on January 30th, 1905.

He appears to have left New Jersey with the intention of staying in the west for an indefinite time. He wanted to get away from his wife and to be divorced from her. He doubtless thought that he could not get a divorce here and that he could get one in Dakota. The mere fact that he went there with that, as the predominant purpose, would not have prevented him from getting a valid divorce there, provided he went *animus manendi*. Such was

the decision in *Tracy* v. *Tracy, 62 N. J. Eq. (17 Dick.) 807*. But as was said in that case if a person go "with the avowed object of living [there] to secure a standing on which to found a judicial proceeding, a violent presumption would arise that the *animus* of remaining was not definite, but was largely determinate upon the termination of such procedure, and that an actual and *bona fide* residence had not been obtained." In *Magowan* v. *Magowan, 57 N. J. Eq. (12 Dick.) 324*, it was said by Chief-Justice Gummere: "He [Magowan] says that his purpose in going to Oklahoma was to become a resident, but it is very clear that if such was his purpose, he failed to accomplish it. To effect a change of domicile, not only must the residence at the place chosen for the new domicile be actual, but to the *factum* of residence there must be added the *animus manendi*."

I think these quotations are applicable to the present situation. The doctor resided in Dakota for the statutory period, but not, as the evidence shows, *animo manendi*. He had no relatives, friends or business acquaintances in Dakota. He had made no business or professional arrangement before going. He says that on his arrival in Sioux City he made application to the president of the state board, who allowed him to practice *until* he could pass that board, which he never took the trouble to do. He took a temporary position at Castlewood, a prairie village of three or four hundred inhabitants, to supply temporarily the place of one of the two doctors who practiced there, but it is evident, from the testimony of his landlady, Mrs. Phillips, that this practice was not very engrossing. His other occupations consisted in playing golf and in doing some optical work in Sioux Falls. The fair inference from his own testimony is that he had no fixed intention of remaining. In his examination in chief he says:

"My intention was to go there and get one hundred and sixty acres of land in the Rosebud Indian Reservation at $1.25 per acre, which was opened by the U. S. Government at that time, for which I did make an application, and I had a little interest elsewhere in South Dakota—and—do you want to know anything more?

"Q. Yes, what was your intention in going out there?

"A. Well, that was my intention to go into this land business, and my mining interest."

He does not here state anything about practicing medicine, although he does mention it in his rebutting evidence.

The mining interest was little more than a myth. Such as it was it consisted of "prospecting" in the Black Hills which, he says, could be reached in a shorter time from New York than from Sioux City, and of $200 in stock. He had visited these hills the year before. It does not appear that he revisited them or that the stock ever acquired any value.

As to the land in the Rosebud reservation, it appears that immediately after reaching Dakota he went to some town whose name he cannot recollect and signed his name to some paper which would entitle him to a drawing, and if he were the lucky man, to a valuable tract. He paid out no money for the privilege. He was not present at the drawing, and did not, in fact, draw anything. He, at once, lost all interest in the subject. Taking his own statement of the objects which were potential in inducing him to select Dakota as a place of permanent residence, it is apparent that they did not materialize. He might have decided to remain there for some other reason, but he did not. He appears to have very soon formed the purpose of going to Denver. Norman H. Squires, a perfectly disinterested witness with whom he played golf in July and August, 1904, says that in one of those months Dr. Carling told him that he thought he would like to go to Denver to practice. After failing to draw anything, what more likely than that seeing no immediate opening in Sioux City or elsewhere in South Dakota, he should make up his mind to go to Denver to practice his profession. The mention of such a determination to the acquaintances that he formed there may possibly explain why he brought his suit in Lincoln county, rather than in Minnehaha county, where his attorney had his office and he himself was living. The case, he says, was actually tried, not in open court, but before a judge at his residence in the town of Mitchell. Whether the trial took place in Lincoln county or in some other county does not clearly appear. It does appear that the action was not tried in the place of his residence and of the reason for this mode of procedure, the defendant can give no explanation. Now, the papers were served upon Mrs. Carling, in New Jersey, in time to defend. He could not therefore have in-

tended to perpetuate the fraud practiced in the *Doughty Case.
Doughty* v. *Doughty, 28 N. J. Eq. (1 Stew.) 581.* It is possible that Dr. Carling may not have cared to testify in open court, in Sioux City, to a fixed purpose to remain in Dakota if he had talked of his intention of going to Denver; but this is mere conjecture.

The doctor, to explain his conduct in leaving Dakota so soon after obtaining his divorce, says that his brother had lung trouble; that in January, 1905, he went to Philadelphia after him and that he took him to South Dakota. He adds:

"I intended to stay there *until I could take my examination* [whether in Dakota or Colorado he does not say], but I decided to go to Colorado, which I thought would benefit my brother more than myself."

The landlady, Mrs. Phillips, says that his brother stayed for a short time at her home, but that she never heard of the lung trouble. The brother himself is not called as a witness, and what became of him after he went to Denver or what defendant was able to do for him does not appear. Whether the Philadelphia trip was taken before or after the divorce was obtained the defendant does not state with certainty. His vague statements in reference to his brother's health do not help him much. They do little more than indicate the ease with which he could change his purpose.

While it thus appears that the defendant gave up his residence in New Jersey, it does not appear that he took up a new residence in Dakota for any other purpose than to get a divorce. The *animus manendi* in Dakota is not proved. That defendant left New Jersey for the purpose of getting a divorce in South Dakota is perfectly plain. He had no other substantial reason for going. He had a practice in New Jersey and he had none in Dakota. He had, as I have said, no business or professional engagement to draw him there. He had no friends or acquaintances there. On his own statement it may be inferred that his intention to remain was conditioned on his drawing a government allotment in the Rosebud reservation. This he failed to do, and having failed, he directed his attention to Denver. He spoke of going to that city within two months after he arrived in Dakota. His

conduct during the fall of 1904 and the winter of 1905, so far from indicating an intention to remain in Dakota, rather indicates the contrary. He made no effort to secure a permanent position of any sort or to settle down to the practice of his profession. He was able within a month or two after reaching Denver to secure a license to practice in Colorado, and, provided as he was, with a New Jersey certificate, it is not likely that he would have found more difficulty 'in securing one that would have enabled him to practice in Dakota. His very vague statement, "I decided to go to Colorado [when he decided, he does not say], which I thought would benefit my brother more than myself," only emphasizes the absence of definite purpose to make Dakota his home. And so the violent presumption arising from his primary purpose in going to Dakota and from his actually leaving Dakota shortly after he obtained the decree, is strengthened rather than overcome by his conduct and declarations during his compulsory six months' residence there. The case does not differ in principle from *Streitwolf* v. *Streitwolf, 58 N. J. Eq. (13 Dick.) 563; 181 U. S. 179.* I think the plea is not sustained.